O. W. WICKS ET AL. V. THE STATE.

*No. 3344. Decided January 18.*

1. **Practice—Motive—Evidence.**—The homicides for which this prosecution was had were committed during the progress of an affray between white persons and negroes pending a trial in a Justice Court. An issue presented was whether the whites or negroes, in pursuance of a conspiracy, were the aggressors, and evidence was introduced supporting the State's theory on the one hand that the negroes were the aggressors, and the defendants' theory on the other hand that the whites were the aggressors. The State was permitted to ask the witness De Bardeleben "why he went armed to the trial of Addie Lytton, the scene of the difficulty?" to which question the witness replied that he "went to see that no harm came to Addie Lytton," and then proceded to detail certain statements foreboding danger to white men at the trial, made to him several days before the homicide by one of the deceased parties. *Held*, that the question was competent as touching the motive actuating the witness in going armed to the trial, and that his direct answer as above quoted was competent evidence on that matter, but in permitting the witness to further detail the statements made to him by the deceased person, the trial court erred.

2. **Same.**—On the trial the witnesses Randel and Jackson were permitted to testify to statements made by co-defendants in the absence of the defendants on trial. Such

evidence was admissible only upon proof of a conspiracy between the said co-defendants and the defendants on trial to commit murder, and that they were made pending such conspiracy and in furtherance of the common design. Under the evidence adduced on this trial the testimony of Randel and Jackson was erroneously admitted.

3. Same—Charge of the Court.—By his own testimony a State's witness clearly inculpated himself as an accomplice 'to the homicides, notwithstanding which the trial court omitted to instruct the jury as to the law governing accomplice testimony, and refused a special instruction upon that question. *Held,* material error.

APPEAL from the District Court of Bastrop. Tried below before Hon. H. Teichmueller.

On the 19th day of October, 1889, an indictment was preferred and returned by the grand jury of Bastrop County against Ike Wilson, Runnels Williams, Bob Thompson, Jesse Johnson, O. W. Wicks, York Aldridge, Fountain Moore, Ben Clark, George Jones, and Milton Nobles for the murder of George Schoeff and Alex. Nolan, in said county, on the 13th day of June, 1889. On the 6th day of November, 1889, defendants were duly arraigned, and plea of not guilty being entered, a severance was had upon motion of defendants, and the defendants O. W. Wicks, George Jones, and Milton Nobles (appellants herein) were placed upon trial together, but separately from their co-defendants. Being convicted of murder in the second degree, the punishment of appellant O. W. Wicks was fixed at twenty years confinement in the penitentiary, and that of appellants George Jones and Milton Nobles at confinement in the penitentiary for seventeen years each. Their motion for new trial having been overruled, sentence was pronounced against appellants in accordance with the terms of the verdict and judgment of the court therein, from all of which an appeal was taken to this court.

The statement of facts in this case covers about 120 pages of the record. The rulings of the court on this appeal do not, however, necessitate a circumstantial recital of the narrative of each separate witness, and only so much of the evidence as is essential to a clear understanding of the opinion is summarized below.

· W. E. Maynard was the first witness for the State. He testified, in substance, that he was the county attorney for Bastrop county in June, 1889. The defendant Wicks was justice of the place for the Cedar Creek precinct, and Isaac Wilson, jointly indicted in this case but not on trial, was the constable of said precinct. Witness went to Cedar Creek to attend court on the 13th day of June, 1889. He reached the church in which the court was held about 9 o'clock a. m. or a little later, and was the first white man to arrive. He found the defendant Wicks at the church, and had some conversation with him about changing the venue in the case of The State v. Addie Lytton, for simple assault. He told Wicks that the defendant in a criminal case pending in a Justice Court had no statutory right to a change of venue, but that a change could be

had by agreement, and that if Mr. Fowler, Lytton's attorney, insisted upon a change to another precinct he, witness, would consent, or would make no objection. While Wicks and witness were talking a negro named Brooks came up and said to Wicks, "Squire, there's no use in sending us off after our guns. Now, there's my gun; it has not been shot off in six months and is half full of dirt. If you want to send for men there's a man you can send," pointing to a man near the church door. Wicks made no reply, but joined the man at the door and engaged him in a conversation which the witness did not hear. Owing to the absence of Ike Wilson, the constable, court did not open until about half past twelve o'clock. Upon his arrival, armed with a shot gun, Wilson entered the church, going in about half backwards, and opened court. Lytton's case was called for trial. Both parties announced for trial, and the trial was proceeded with. When the jury retired to deliberate on the case, the witness stepped out of the house. Returning within a few minutes he took a seat on a bench in front of the pulpit, about six feet from where Wilson was sitting with his shot gun across his lap. Wilson beckoned to witness and witness moved to a seat beside him and leaned towards him, as he appeared to wish to whisper to witness. Just then Wilson pushed witness aside, rushed to the door, exclaimed, "Hold up, Mr. Lytton," and fired his gun. Witness left the house by the east window. The shooting became general about the time the witness got out of the house, and appeared to proceed from all directions. Immediately after the shooting the witness started into the house and, *en route*, found the dead body of George Schoeff in front of the church, and Alexander Nolan lying near so badly wounded that he died that evening. A few days before the tragedy the witness met the defendant Jones in front of Jenkins's saloon in Bastrop, on which occasion Jones asked witness if he would be at Cedar Creek on Tuesday—the day of the tragedy. Witness replied that he would, and Jones said, "Come out; we will all be there ready to stand by you."

Cross-examined the witness said that the conversation between Wicks and Brooks was carried on in an ordinary tone of voice and neither of the parties appeared to attempt secresy. No person that witness observed followed Wilson when he walked down the church aisle just before the shooting, and no person was with Wilson in the door when he fired the first shot.

Gus Randel, for the State, described the wounds on the persons of Schoeff and Nolan. Several buckshot entered Schoeff's breast at its junction with the neck, and were close enough together to be covered by the hand. Nolan was shot through the head. A few days before the killing the witness heard Ira Rice, a young negro who worked in the blacksmith shop of Robert Thompson, jointly indicted with these defendants, ask said Thompson if he had heard about Ike Wilson arresting an old white man,

-tying him, and forcing him to walk to Bastrop. Thompson replied, "Shut your damned mouth. There will have to be a lot of men killed at Cedar Creek before they can realize that negroes have the right to hold office." This is the evidence in part referred to in the second ruling on this appeal.

Joe Jackson testified for the State that he was at Cedar Creek church at the time of the tragedy. Several colored men armed with guns were there. Some of them went behind Dick Lemuel's house with their guns when the shooting commenced, but witness did not know what they did with their guns. Defendant Nobles, before the fight began, asked witness if he brought his weapons with him. Witness replied that he did not, and Nobles asked him if had not heard the reports that were in circulation. The witness replied that he had not, and Nobles said, "It is reported that the white men are coming here to kill Ike Wilson." On the same day, and shortly before the shooting, Runnels Williams, one of the indicted parties, told witness that "all negroes who did not intend to fight ought to leave the place, as they would incur more danger than those who were going to fight, as the latter could lie down and shoot." This testimony is also involved in the second ruling of the court.

Dr. Bradfute testified for the State that he heard a conversation between Ike Wilson and Andrew Jackson between 9 and 10 o'clock on the fatal morning. Wilson told Jackson to meet him at Cedar Creek church during the morning, as he expected trouble. Jackson replied, "I don't think there will be trouble." Wilson replied, "I reckon it will come. You come up there. It will come! It will come!"

W. B. Morgan testified for the State that George Jones, one of the defendants, was at Givens's store, near the Cedar Creek church, on the morning of the fatal day. Thence he went toward Robert Thompson's blacksmith shop, and afterward passed the store going toward the church. He had a gun with him each time that witness saw him. Richard Miller had a gun at Thompson's shop on that morning, and discharged it behind the shop. Witness sold some buck shot to the defendant Nobles on that morning.

Cross-examined the witness testified as follows: "I was clerking for Ed Givens on the 29th day of May, 1889. Addie Lytton was there that day. Ike Wilson was also there. I saw Ike Wilson come across the street. I saw Addie Lytton go to his little black pony, which was hitched in front of the store, and get his Winchester rifle from his saddle. Lytton retired to the back portion of the store. Wilson came in and said something to Lytton. Wilson had no weapon that I saw. At the time Wilson spoke to Lytton the latter had his gun presented. Wilson left, and shortly afterwards J. H. Jenkins came up and went in the direction of Louis Priest's, the direction Lytton had gone. Just after Lytton got his gun from his

saddle, several men who were in the store left and went over to the other side of the street."

Aaron Thompson testified for the State, in substance, that on the morning of and before the trouble at the church Ike Wilson came to his house and borrowed his gun. He then asked witness to go to the church that day; that it "looked like things were going to drop off the handle." Thereupon the witness took his gun back and refused to lend it.

On cross-examination this witness testified as follows: "I went up to Givens's store about 2 o'clock that day. I saw a number of armed white men there that day. There was Mr. John White, Richard De Bardeleben, Billy Strother, Heck Glass, Sr., Heck Glass, Jr., and others with arms, there. They had Winchester rifles and shot guns, and were sitting under a mesquite tree in front of the court house. Just before the shooting began I was standing looking in at the window at the back end on the north side of the house. I heard Wilson say, 'Hold up, Mr. Lytton,' and Lytton went on out of the house. I then moved on down to the front end of the house. I saw the white men rise up with their guns presented at Wilson. Some one cried out, 'Get back, you God damned black son-of-a-bitch!' Wilson backed back, and Mr. Billy Strother, who had been sitting in front of the house, to the right of the mesquite tree, fired at him. The firing then became general, and I ran away."

J. P. Fowler testified for the State as follows: "I was at Cedar Creek on Tuesday, June 13, 1889. Was in the front part of the house when the shooting began. The case of Addie Lytton had just been submitted to the jury; the jury had retired. Mr. Lytton spoke to me and said he wanted to go out. I told him to speak to Wilson and it would be all right. He spoke out, turned his face towards Wilson and said, 'I want to go to the door a minute.' He then got up, passed to the end of the bench in three or four feet of Wilson, passing around the end of the bench out there in the center of the house, walking leisurely to the door. About the time he got to the door Wilson jumped up, grabbed his gun in an excited manner, and started to the front of the house, and while in the house and just before getting to the front, he threw his gun around in front of him, cocking at the same time both barrels. As he got in the door he called out, 'Hold up, Mr. Lytton,' at the same time throwing his gun up to his shoulder, and as Lytton's face turned towards him he fired. He instantly fired again, Lytton in the meantime falling to his hands. He then put his gun in the house against the door and drew his six shooter. Bob Thompson by this time had gotten around nearly to him. George Schoeff and Sam Glass were running out in the direction of the elm tree. Runnels Williams who was near the wagon bed with a gun, and Ike, from the door, with a six shooter, both fired on Schoeff at the same time. Schoeff fell, shot through from the front and shot through from the back. Bob Thompson instantly and immediately after

this fired on Alex Nolan, who was behind the elm tree. Nolan fell, and the shooting was so thick and fast that you could not tell which direction it came from. After Ike started to the front I saw Bob Thompson get up and start to the front, and as he walked along I noticed he was putting his right hand under his left shoulder. When I next saw him near the door he had a pistol in his hand. When Ike started to the door I got up and started right after him, and at the time Ike Wilson shot I was in a position to see the men under the tree and they seemed to be perfectly quiet, sitting down under and around the tree. I was employed by Addie Lytton to defend him in the court there that day. I got to Cedar Creek in the morning of the shooting, about 9 o'clock. I met Addie, talked the case over with him, and went up to the court house to see Wicks. I saw him and told him that Lytton did not want to be tried before him; that he was afraid Ike would not treat him properly; that Lytton had heard that Wilson had threatened to kill him; that Lytton had heard that Wilson had arrested an old fisherman up on the river, tied him and walked him to Bastrop, and that he feared indignities at the hands of Wilson, and that Addie Lytton for these reasons wanted a change of venue to Bastrop or some other justice of the peace in Bastrop County, I telling him that the county attorney would raise no objections, and would consent to have the case changed to another place for trial if he would. Wicks replied that Lytton's objection to being tried before him was because he did not want to be tried before a negro, and that if he let Lytton move this case, then any white man who had a case before him would want to move his case; that he intended to try Lytton's case, and all other cases that come up before him, white or black, or some such conversation as that. In this conversation he said that the white men were determined that the negroes should not hold court, and if the trouble had to come off, it might as well come off that day as any time. I saw Alex. Nolan after he was shot. He was shot in the forehead just in the edge of the hair, and the ball came out of the back of the head. I saw George Schoeff after he was shot. He was shot in the back with a six shooter ball, and was shot in the lower part of the neck in front with a big load of buck shot. Both Schoeff and Nolan were in their shirt sleeves and unarmed. Before the shooting was over I saw a six shooter some six or eight feet from the pulpit, and about ten feet from the northeast window. On the day West Craft was arrested I had a conversation with him in the sheriff's office. While there defendant Wicks came in and whispered something to him that I did not hear, but when he went out I asked West what it was, and he replied that it was not to tell on him or give him away."

Cuffie Williams testified for the State to the effect that a few minutes before the shooting began he heard the defendant Wicks call to West

Craft, and then saw Wicks go up to and hold a brief conversation with. Craft in a low tone of voice. He did not hear what was said.

The material part of the testimony of West Craft for the State was as follows: "I was at Cedar Creek on the day of the shooting. I got there about 2 or 2:30 o'clock. I got down off my horse and was talking with Jesse Johnson and some boys. While sitting there Cuffie Williams came up, beckoned, and called me. I got on my horse, started towards him, and we met. As we started off O. W. Wicks, defendant, called me and told me he wanted to see me. Wicks was getting out one of the windows on the side of the court house next to Dick Lemuel's. I went to him and he came up to me and asked me where I was going, I still being on my horse. He whispered to me and told me not to go away, and then made some remark about the white people being there. In the conversation Wicks said for me not to go away; that he had me deputized to help protect the court; that we would bring the thing off directly, and that he wanted me to stay there, and wanted the negroes to hang together and kill as many of the devilish white folks as they do of us. Cuffie Williams and I then started off towards Givensville. I heard Ike Wilson halloa 'halt,' or 'come back.' About that time I looked back and saw Ike throw up his gun, and a fire was made, but I can not say who made it. The shooting then all began, and I shot, too. I shot in every direction. On the first Saturday after the difficulty I was arrested at Bastrop, and Wicks was at the court house when I was brought down there. Mr. Fowler was acting for the State, and fixed up the papers against me. When first arrested I requested to have a private talk with Mr. Fowler, and Wicks was there, or came in. there shortly afterwards. While in the sheriff's office talking with Mr. Fowler, Wicks came in, leaned over the table, and whispered to me, and told me not to give him away or tell anything on him, and I told him I did not know anything to tell. When he left, Mr. Fowler asked me what he said, and I told Mr. Fowler."

Heck Glass testified for the State that he saw Ike Wilson and Runnels Williams shoot George Schoeff. He then saw George Jones shooting towards the white men.

James Simmons testified for the State that Wilson fired the first two shots, and Runnels Williams fired the third shot, shooting George Schoeff. When Runnels Williams, who was sitting on a pile of logs just before the shooting commenced, shot Schoeff, then in a second the general shooting commenced, and it seemed to come from every direction. Witness saw Milton Nobles shooting with a six shooter from the logs toward the white men. He saw George Jones shooting from the right hand window towards the white men. This was the southwest window. When Wilson fired the first shot witness jumped up, but never moved until he fired the second shot at him, witness, and little Bob Glass. He then ran off about fifteen steps from the mesquite tree, southeast. When he got to

this point the third shot fired, and the shooting became general. Witness than ran into the pasture. He had known George Jones for more than two years, but swore at the examining trial that he never saw said Jones before the day of the shooting.

Tom Christopher testified that he saw George Jones, Orange Wicks, and Lawyer Chase (Fred Chase) shooting from the window towards the white men while the shooting was going on. They were shooting from the southwest window, towards the white men.

Jim Priest, a witness for the State, testified that the first shot was fired, and then two more and then a continuous volley. "I saw George Jones and Orange Wicks shooting out of the window as I went along down the side of the house. They were shooting towards the white men. They were shooting from the southeast window, which is the window on the south side, next to the pulpit, at the back end of the house. There had been a volley from the front before I saw them shooting."

John White testified for the State as follows: "I was present at the Cedar Creek difficulty June 13, 1889. I got to Givens's store about 9 o'clock. There were no armed white men there when I got there. Afterwards I saw Dick (W. R.) De Bardeleben, Billy Strother, Heck Glass, Sr., Heck Glass, Jr., August Schwartz, Wayne Smith, and Jim Flint there about Givensville with guns. We afterwards went up to the court house and stopped under the mesquite tree. When the shooting commenced I was near the mesquite tree, and Runnels Williams was to my left, near a wagon bed. Heck Glass, Sr., Heck Glass, Jr., Sam Glass, Alex. Nolan, George Schoeff, August Schwartz, Louis Meinecke, Jim Simmons, the two Wells boys, and Mr. Flint were under the tree when the shooting commenced. Schoeff and Nolan were not exactly under the tree, but were near it. Dick De Bardeleben, Bud (Tom) Christopher, and Jim Priest had just stepped off a few steps when the shooting commenced. I saw Milton Nobles, Richard Miller, and York Aldridge shooting there that day. I was armed with a rifle and participated in the fight. I shot at Sherman Moore after he shot at me. Sherman Moore was killed there that day."

W. R. De Bardeleben, a witness for the State, testified as follows: "I was at Cedar Creek on the day of the shooting. I suppose I went there about 10 o'clock. I went there to see Addie Lytton tried in court. I was armed with a Winchester rifle. We went there to see that no harm came to Addie Lytton. It was near 3 o'clock when the shooting commenced. John White, Heck Glass, Sr., Heck Glass, Jr., Sam Glass, Bud Christopher, Billy Strother, Louis Meinecke, August Schwartz, Jim Simmons, Julius Steiner, Wayne Smith, Mr. Flint, John Wise, Scott the fisherman, the two Wells boys, a brother of Mr. Flint, Alex. Nolan, George Schoeff, Billy Glass, Jim Priest, Joe Woodruff, and Bob Glass, all of whom were white men, were there just before and at the time of the shooting. John

White, Billy Strother, Heck Glass, Sr., Heck Glass, Jr., Wayne Smith, August Schwartz, and myself were the only white men I saw there with guns. The case (Addie Lytton's) had been on trial I suppose a couple of hours, and the jury had retired about a hundred yards in the pasture to make up their verdict when the shooting took place. At the time it began I was behind the house and had just got there. I had been sitting in front of the house by the mesquite tree, and had passed behind the house when the jury retired. I left at the mesquite tree John White, Bill Strother, Heck Glass, Sr., Heck Glass, Jr., Meinecke, August Schwartz, Julius Steiner, and Bob Glass under the mesquite tree. George Schoeff, Sam Glass, and Alex. Nolan were off a little to the left, under the shade of the elm tree. Christopher had walked out towards his horse. Jim Priest was with me behind the house when the shooting began. The first thing that attracted my attention was I heard Ike Wilson say, 'Hold up, Mr. Lytton,' and a shot immediately followed. This shot appeared to be in front of the house. In about one second or so there was one more shot followed, and then in a short time there was a large number of shots. They seemed to come altogether, like a bunch of fire crackers. I had a shot gun in my hands behind the house. It was Wayne Smith's, who was on the jury. Addie Lytton's gun was on the ground. Heck Glass, Sr., Heck Glass, Jr., Bob Glass, Jim Priest, Alex. Nolan, and Bill Strother are all relatives of Addie Lytton. I came to the court house in company with Addie Lytton, John White, Billy Strother, Heck Glass, Sr., Heck Glass, Jr., and August Schwartz. All of these except Addie Lytton were armed. Lytton had given his gun to Heck Glass, Sr. I, too, was armed. We went to the court house between 9 and 10 o'clock, and remained there until the trouble began, about 2:30 o'clock. We did not go away for dinner."

The material part of the testimony of Addie Lytton was that about the time the jury trying him retired to consider of their verdict, he, the witness, mentioned to his attorney, Mr. Fowler, that he wanted to go out and urinate. Fowler told him to speak to Ike Wilson. Witness did so, and Wilson, without replying, nodded his head, and witness thinking he had Wilson's permission, walked leisurely out. When he reached a point outside, five or six steps distant from the door, Wilson called to him, "Hold up, Mr. Lytton." Witness stopped and turned around, and was fired upon by Wilson before he had time to utter a word. Buckshot took effect in his face and breast, and he was afterwards shot in the back.

The evidence for the State shows that a large number of negroes, many of them armed, congregated at the Cedar Creek church and participated in the shooting, which was brought about by the firing of the first shot by Ike Wilson.

The theory of the defense was that the whites had threatened to interfere with the officers of the court in the discharge of their duties, to rescue Addie Lytton, whose trial for assault was pending before the de-

fendant Wicks, to accomplish their purpose by force, and to kill Ike Wilson if necessary, etc.; that they congregated in large numbers, several of them being armed, and took position under a mesquite tree a short distance from the front of the house; that when the jury in Lytton's case retired to deliberate on the verdict, Lytton left the house; that Wilson, the constable, followed and called to him to await the verdict of the jury; that the whites then rose in mass at the cedar tree, handed Lytton a gun, and opened fire on Wilson, and that Wilson did not return the fire until he had been fired upon at least twice.

Green Pierson, for the defense, testified as follows, "I was in Austin on May 29, 1889. Heard a conversation there that night in W. B. Walker's wagon yard between James Flint and Fletcher Caldwell. Flint told Caldwell that Ike Wilson had a writ for Addie Lytton and that Addie was not going to be arrested, but that a lot of white men had made it up to break up the court."

Simon Freeman testified for the defense, in substance, as follows: "Mr. Lytton stepped out of the house, and a few steps behind him was constable Wilson; I heard Wilson say, 'Hold up, Mr. Lytton, hold up.' About that time all the white men rose up and presented their guns. Lytton by this time had reached the white men, and some one in the crowd of white men said, 'Get back, you God damned black son-of-a-bitch.' This was said in a loud and angry tone of voice. Mr. Lytton reached over to get a gun, and some white man handed him a gun. Seeing this I ran back to the corner of the house. Wilson also retreated backwards. When I got back to the corner of the house I heard the firing of one gun, but I am unable to state who shot it. After this first shot the firing immediately became general."

Henry Wilson testified as follows: "As Isaac stepped out of the door he said, 'Hold up, Mr. Lytton,' and as soon as ever this was done the men around the tree jumped up and said, 'You get back; is that your game?' As they did this their guns were in a position to shoot. Isaac stepped back into the door and the shooting commenced. During the shooting there was nobody in the door but Isaac Wilson, and I don't know how he stayed because they were shooting at the door the fastest kind. No one shot from the door but Isaac while I was there, and I stayed there until he made his last fire. I never saw George Jones shooting there that day. I did not see him with any arms there at all. I remained in the house five or six feet from the door during the shooting. After the first shot the shooting became general and you could not distinguish one shot from another; they seemed to come altogether like hail. On the left hand side of the door coming out, the door facing is literally torn all to pieces and splintered with balls. The house is badly shot up. That morning after Isaac opened court I saw old man Heck Glass get on his horse and

ride off down to Givensville in the biggest kind of a run and come back right straight with a gun."

Thomas Hedspeth testified as follows: "I was standing off to the left of the white men when the shooting began. My attention was first attracted by hearing some one say 'Halt.' I then heard some one say 'Hold up, Mr. Lytton;' I looked up and it was Wilson telling Mr. Lytton to halt. Mr. Lytton had just gone out doors. Wilson was just behind him. Mr. Lytton never made any halt at all; he went right on into the crowd of white men that were sitting there. I heard some one in the crowd of white men say, 'Get back, you God damned black son-of-a-bitch,' and the white men all sprang upon their feet with their guns pointing right at Wilson. Wilson backed back and a gun fired. It sounded to me like a Winchester rifle. There is a difference between a shot gun and a Winchester rifle which any one can tell. The shooting then all came at once, and I ran behind a little house right there at Lemuels's place, and stayed there until the shooting was over. There was no shooting from behind the little house or from behind Dick Lemuels's house."

Joe Holmes testified for the defense as follows: "Wilson came out of the door. Lytton was in front of him. Lytton reached the crowd and stooped over. I could not see what he did when he stooped over or what he got, or whether he got anything or not. The white men around the tree all rose with their guns, and a gun fired. There was considerable noise there in front, as of people talking, but I could not tell what it was. The shot seemed to me like a Winchester rifle. I am positive the men had risen with their guns before a shot was fired. I saw Orange Wicks after the shooting. He had no arms. He was behind the pulpit."

Ed. Jones testified as follows: "Lytton came out of the house, and Wilson came out behind him and said, 'Hold up, Mr. Lytton.' I then saw Wilson run backwards into the house, and I started to run. As I did so a shot fired. It sounded like a Winchester."

Lee Priestly testified as follows: "When the difficulty came up I was sitting between the mesquite and the elm trees, just in front of the court house, where Mr. Maynard's horse was hitched. My attention was called by Ike Wilson telling Mr. Lytton to come back. He called him twice before he got to the door. After he got to the door he told him to come back and wait till the jury decided his case. Mr. Lytton kept on walking, and went on into the crowd of white men sitting by the tree. Ike Wilson got out between two and three steps from the door. I saw Mr. Lytton reach down among the crowd after he got there. I don't know what he was reaching after. Billy Strother was lying off behind the crowd to the left, looking toward the house, from the crowd. He raised up and halloaed, 'Get back, you God damned black son-of-a-bitch!' Wilson went to get back into the house, and Billy Strother fired at him with his Winchester rifle. As Strother got up the whole crowd of white men

rose with their guns presented. After Strother shot I ran into Dick Lemuels's house. When he shot, immediately afterwards all the shooting seemed to begin together. There was no shooting in or from Dick Lemuels's house."

Stuart Moore testified as follows: "I was not in front of the house when the shooting began. Saw Lytton come out of the door and Wilson come out behind him. Wilson said, 'Hold up, Mr. Lytton.' Lytton went right on into the crowd of white men. I saw him stoop over, but could not see whether he got anything. About that time the crowd of white men jumped up with their guns drawn on Wilson. Wilson backed back into the door, and Billy Strother shot at him. I then ran behind Dick Lemuels's crib and stayed there until the shooting was all over. There was no shooting from behind the crib, and none from behind the little house or kitchen close to Dick Lemuels's dwelling house."

R. A. Brooks testified: "I am a lawyer of the Bastrop bar. Was at Cedar Creek on June 13, the day of the difficulty. I went there to attend to some cases I had in Wicks's court. I went out there with Mr. Fowler and Mr. Maynard. Just before the difficulty began I had been out lying down under the mesquite tree. There was a number of armed white men out there. There was certainly as many as eight; there may have been more, probably ten. After the jury in the Lytton case had gone out I got up to go into the house. I passed Mr. Lytton, who was on the outside, and a few steps inside the house I met Wilson in the aisle; he seemed to be excited. I heard him say, 'Hold up, Mr. Lytton,' and I looked around. The armed white men had risen to their feet with their guns presented. Being in a direct line with these guns, and thinking that the shooting was going to begin right then, I jumped to one side, and the fire came in a crash. I jumped to the south side of the house, close to the southwest window. The shooting was then coming thick and fast. I hesitated there a moment, then ran diagonally across the hall and jumped out of the window behind the pulpit. I got under the edge of the house and remained there until the shooting was pretty much over. About ten minutes after the shooting a tall white man, who I think was Tom (Bud) Christopher, remarked to me that if I had not been in the way he would have killed Ike Wilson at one time. Before the shooting was all over a colored man came to me, and, wringing his hands, said, 'Oh, Lord, oh, Lord, Mr. Brooks, ain't this hell?' I replied, 'Yes, this is hell.' A day or two after the shooting, Milton Nobles, the defendant, who was then in jail, asked me if I did not remember talking with him at this point. He then repeated the above words used by the party, and also gave my reply, 'Yes, this is hell.'"

Gregory Caldwell testified: "I was at Cedar Creek on the day of the difficulty. Was sitting by Dick Rose whittling when the trouble came up. We were by the fence, near the pile of logs, at the time. Alfred Williams

and Morris were near us.  I saw Wilson come out the door and call out, 'Hold up, Mr. Lytton.'  I punched Dick, gave him the signal, and at that time the white men all rose up with their guns presented.  There was a noise among them, but I could not tell what they said.  I turned to run, and a gun fired; it was a rifle.  I know Milton Nobles well.  I did not see him around the pile of logs, or anywhere there, before or at the time of the shooting."

Fred Chase testified:  "I am a lawyer at this bar.  Was sitting on the bench in front of the pulpit when the trouble came up.  I heard Wilson tell Mr. Lytton to hold up, and I looked up and I saw the armed men rising with their guns drawn on Wilson, and being on a direct line with those guns I thought there was going to be shooting and ran behind the pulpit, where I stayed until the shooting was over.  Orange Wicks, the defendant, and I got behind the pulpit about the same time.  I may have been a second or so ahead of him but we made it there about the same time.  Wicks was sitting at the table in front of the pulpit when the trouble began.  He came around one end of the pulpit and I came around the other.  We laid there together until the shooting was all over."

Alfred Meredith testified:  "I was sitting at the southeast corner of the church house when the trouble began.  Saw Lytton pass into the crowd and Wilson come out behind him and call out, 'Hold up, Mr. Lytton.'  Wilson was outside the house when this was said.  There was considerable noise among the white men sitting around the mesquite tree, who all rose up with their guns presented, but I could not tell what they said.  There was a shot fired, but I could not tell who fired it.  It came from in front of the house to the right of the tree seemingly.  The men had risen with their guns presented before there was a shot fired.  I ran away then.  After the first shot the shots came all together."

Morgan Nichols testified for the defense:  "I was sitting at the southeast window, the one next to the pulpit on the south side of the house, when the trouble began.  When the first shot was fired I jumped out to one side there, and a little after the general shooting began.  I know Orange Wicks, Fred Chase, and George Jones.  None of them shot from that window while I was there.  There was no shooting from that window at all.  There was a first shot and then the shooting came altogether."

Richard Rose testified:  "I was sitting out in front with Gregory Caldwell when the shooting began.  I know Milton Nobles well.  I did not see him around the pile of logs or any where in front there before the trouble began."

George Jones, one of the defendants, testified:  "When the shooting began Milton Nobles and I were sitting together on a bench.  I was shot in the shoulder.  I had no weapon and did not shoot at any time there that day."

The defendant Wicks testified, in part, as follows:  "I got up to the

court house about 8 o'clock. I met Ike Wilson on the street at Givensville, shortly after I got to Givensville, just beyond Robert Thompson's shop. I asked him if he had caught Dan Smith. He said, 'Damn it, don't talk to me! This is no time to be talking. Don't you see those armed men up there?' There were a number of armed men at Givensville at that time. When Ike came in he did not walk in straight, but came in about half backwards. He opened court, came back to the pulpit, and sat down with his gun across his lap and his pistol by his side. For a minute or so everything was perfectly still. When Addie Lytton's case closed and the jury had retired, Mr. Maynard, Peter Bell, and I got to talking about Peter's case. We went up to the table. I was on one side and they on the other. Fred Chase was there doing some writing for me. I heard some one say, 'Mr. Lytton! Mr. Lytton! Mr. Lytton!' When I looked around Wilson and Lytton were both out of doors. Mr. Strother was on the left of the white men as you come down from Givensville, and as I looked out all of the armed white men just rose right up with their guns presented, and some one said, 'Get back, you God damned black son-of-a-bitch!' and I ran behind the pulpit. Mr. Chase and I got there about the same time. I think I was a little ahead. I saw no more of the difficulty. I remained behind the pulpit with Mr. Chase until the shooting was all over. I had no arms there that day. I sent for none, and had nothing whatever to do with the difficulty. I did not summon any one there, nor send for any one. I do not remember to have had any conversation with George Brooks there that day. I was considerably worked up about all those white men being there with their Winchesters and shot guns. I had no conversation with Craft there that day, and did not tell him not to go off, nor that we would bring it off directly, and we wanted to kill as many of the devilish white men as they did of us. I was standing in the door as West Craft rode by, and I told Lee Priestly, I think it was, to call him back. West came back towards the court house. I was still standing in the door, and told him not to go off, that I wanted to see him. I wanted to see him about some peas we were going to purchase together. He said he was going down to the store, but would be back directly."

J. H. Jenkins testified for the defense: "I am a deputy sheriff of Bastrop County. Was at Givensville on or about the 29th of May last. Had passed through town when Runnels Williams came after me and said Ike Wilson wanted me to come up to Givensville. I returned and when I reached the town Ike Wilson gave me a warrant and asked me to arrest Addie Lytton. I took the papers and arrested him at Louis Priest's."

Jeff Davis testified: "I was at Givensville on May 29. Mr. Jenkins came through and asked for Ike Wilson. Ike came shortly afterwards and went on after Mr. Jenkins. While Ike was gone Mr. Addie Lytton came up on his little black pony and hitched him in front of the door.

Ike came back, stopped in front of Bob Thompson's shop and got down. Some one said, 'There comes Ike.' Mr. Lytton went to his pony, got his Winchester rifle and went back into the store. Mr. Lytton was standing in the back of the store with his rifle drawn. Wilson had no arms that I could see. Wilson said, 'Things look pretty rollicky, Mr. Lytton.' Lytton replied, 'I don't want a damn word out of you.' All this time Lytton had his gun presented. Wilson said, 'I've got some papers for you, Mr. Lytton,' and Lytton said, 'I don't want a damn word out of you.' Wilson then went after Mr. Jenkins."

Laura Williams testified: "Am wife of Runnels Williams. On Wednesday night before the shooting, Ike Wilson stayed all night with us. Next morning Ike and Runnels and I were sitting on the gallery, early, about breakfast time, and we saw Jim Priest riding down the road in the direction of Givensville with a gun on his shoulder."

Tom Hayden testified: "On Tuesday before the shooting on Thursday I told Ike that some white men had said there in the shop that they were going to have trouble in the Cedar Creek court on Thursday. Ike replied, 'I reckon not.'"

Sol Wright testified: "I saw Ike Wilson on the morning of June 13, the day of shooting, between 8 and 9 o'clock. He was going in the direction of Givensville. I told him I was going to Bastrop, and he told me to ride up fast and get to Bastrop and tell Mr. Bell, the sheriff, to come out to the Cedar Creek court right away, that he feared there was going to be trouble there that day. I came on to Bastrop with Fulton Edmundson, but we could not find Mr. Bell. He was not in town."

Lee Priestley, a witness for the defense, testified as follows: "I was sitting in front of the house when West Craft rode around there. He was riding off when Orange Wicks told me to call him. I did so, and he rode back. Wicks came to the door and called out to West not to go off, he wanted to see him. Wicks did not come out of the door and said nothing further. West told him he would come back after awhile and rode off."

*G. W. Jones* and *H. M. Garwood*, filed an able brief and argument for appellants.

*W. L. Davidson*, Assistant Attorney-General, for the State.

WILLSON, JUDGE.—O. W. Wicks, George Jones, and Milton Nobles, and several others were jointly indicted for the murder of George Schoeff and Alex. Nolan. The three above named defendants severed from their co-defendants, and were tried jointly. All three of them were convicted of murder in the second degree, and from that conviction jointly prosecute this appeal, assigning several errors.

The first assignment of error is that the court erred in admitting the

testimony of the witness W. R. De Bardeleben, as per bill of exceptions No. 1, which bill of exception recites as follows:   "W. R. De Bardeleben, a witness for the State, was asked the question by the prosecuting attorney, 'What was the reason you went down to the trial of Addie Lytton, the scene of the difficulty, with a gun?'   To which the witness replied, 'We went there to see that no harm came to Addie Lytton, and because several days before the difficulty Alex. Nolan, now deceased, had told me that he, Alex. Nolan, had heard Ike Wilson tell Robert Thompson that he was going to summon a lot of men to the court and kill off white men, and that he was going to arrest Addie Lytton this time and carry him to Bastrop.'   This witness further stated that Addie Lytton had told him, the witness, that he, Lytton, had heard that Ike Wilson had threatened to kill him, and that he was afraid that Wilson would mistreat him at the trial; and that he, De Bardeleben, had heard that Ike Wilson had arrested an old white man down on the river and tied him, refused him bail, and walked him to Bastrop.   To which question and answer defendants then and there objected for the reasons: (1) Same was hearsay; (2) irrelevant; (3) the declarations of Ike Wilson or Robert Thompson were not admissible against these defendants, or either of them, because the declarations were not made in pursuance of a common design, and no conspiracy had been proved between these defendants, or either of them, and Ike Wilson and Robert Thompson, or either of them.   These objections were then and there overruled by the court, whereupon defendants, by counsel, excepted, and now here present their bill of excepitons, and pray that same be signed, sealed, and made a part of the record."

In approving said bill of exception the trial judge adds thereto an explanation that said testimony was offered and admitted for the sole purpose of showing the motive of said witness in going armed to the scene of the difficulty.

It is sometimes relevant and material to show the motive actuating the conduct of a witness, and in the case now under consideration there can be no question but that it was material for the prosecution to show, if it could, that the witness and other white men who went armed to the scene of the tragedy, went for a legitimate, innocent purpose, and not for the illegal purpose of interfering with the court, or its proceedings, or with the execution of the law.   There was much conflict in the testimony as to which side, the whites or the blacks, began the difficulty which resulted so fatally.   On the part of the prosecution it was and is contended that the blacks brought on the fight in pursuance of a previously formed conspiracy.   On the part of the defendants it was and is contended that the whites brought on the difficulty in pursuance of a previously formed conspiracy.   There is evidence tending to sustain both these theories.   In this state of case it was relevant and material for the prosecution to show that the whites, in going armed to the place of the difficulty, were in-

fluenced by innocent motives. Proof of innocent motives on their part would be a circumstance tending to support the theory that they did not bring on the difficulty, but were the assaulted party. We are of the opinion, therefore, that the question propounded to the witness De Bardeleben, was legitimate and proper. A portion of said witnesses answer to said question, to-wit, " We went there to see that no harm came to Addie Lytton," was admissible. But the remainder of his answer to said question was purely hearsay and was not admissible for any purpose. When viewed in connection with the facts of the case, this illegal testimony must have operated prejudicially to the defendants, and its admission was therefore material error. Proof of motive, like proof of any other fact, must be made by legal testimony.

The second and third assignments of error call in question the correctness of the rulings admitting certain testimony of the witnesses, Gus Randel and Joe Jackson, as to statements made by Robert Thompson and Runnels Williams, co-defendants in this prosecution. These statements were not made in the presence of the defendants on trial, and were hearsay as to them and inadmissible against them, unless a conspiracy to commit murder existed between said Thompson, Williams, and these defendants, and unless said statements were made pending such conspiracy, and in furtherance of the common design. As we view the evidence before us, the testimony of said witnesses Randel and Jackson as to the statements made by Thompson and Williams should not have been admitted, and its admission was material error.

There are several assignments of error relating to supposed defects in the charge of the court. No exceptions were saved to the charge, and upon a careful examination of the same in the light of the objections urged against it, we think it is an able, clear, and correct exposition of the law applicable to the facts of the case, and free from any material error, except in one particular, which is, that it does not instruct the jury as to the rules governing accomplice testimony. Such instruction was demanded, we think, by the testimony of the State's witness West Craft. Said witness, by his own testimony, showed himself to be an accomplice in the killing of the white men, and his testimony was prejudicial to the defendants and especially so to defendant Wicks. Defendants requested a proper instruction as to accomplice testimony, which the court refused to give, and in this we think material error was committed.

We deem it unnecessary to discuss other assignments of error, as some of the matters complained of may not occur on another trial, and we find no material errors except those we have mentioned, and because of which material errors the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Hurt, J., absent.